

ORDERED in the Southern District of Florida on June 26, 2018.

John K. Olson, Judge
United States Bankruptcy Court

___

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In re:

Case No.: **16-16621-JKO**

**Darryl Edwin Williams,**

Chapter   7

Debtor.
_____/

### ORDER OVERRULING CHAPTER 7 TRUSTEE'S OBJECTION TO CLAIM OF EXEMPTION IN NATIONAL FOOTBALL LEAGUE PLAYER'S CONCUSSION INJURY LITIGATION SETTLEMENT [ECF 204]

**THIS CASE** came before the Court for a hearing on April 4, 2018, upon Trustee's Objection to Claim of Exemption in National Football League Player's Concussion Injury Litigation Settlement (the "Disputed Exemption") [ECF 204].  After hearing argument from both parties, and because this appears to be an issue of first impression, the matter was taken under advisement.   Upon further consideration, the Trustee's Objection [ECF 204] is **OVERRULED**.

**Procedural History**

Debtor Darryl Edwin Williams initiated this case by filing a voluntary petition for Chapter 7 relief on May 6, 2016.  On July 5, 2016 and July 20, 2016, Debtor filed his first and second amendments to his initial Schedule C, listing property to be claimed as exempt, neither of which contained the Disputed Exemption [ECF 43 and 62].  Trustee filed an Agreed Motion for Denial of Discharge [ECF 152], signed by the Debtor, on February 10, 2017, and the Court granted that motion on March 1, 2017 [ECF 162].  The Debtor will accordingly not receive a bankruptcy discharge in this case.  On December 6, 2017, Trustee noticed a Rule 2004 Examination of the Debtor (the "Examination"), which was conducted on January 10, 2018 [ECF 182].  Following the Examination, Debtor filed his third amended Schedule C, which this time *did* include the Disputed Exemption [ECF 183].  The Trustee subsequently filed an objection to the exemption, asserting, *inter alia*, that the descriptions of the underlying asset were too vague (the "initial objection") [ECF 187].  Thereafter, Florida Asset Recovery Group, LLC ("FARGL" or the "Creditor") filed a joinder into the Trustee's initial objection [ECF 191].  In response to the initial objection, Debtor filed his fourth amended Schedule C, which provided greater detail as to the asset in question [ECF 197].  At the hearing on the Trustee's initial objection, the Debtor had already filed a fourth amended Schedule C, and so the Court dismissed the matter as moot and gave the Trustee and Creditor until March 8, 2018, to object to Debtor's fourth amended Schedule C [ECF 200].  On March 7, 2018, Trustee filed an objection to Debtor's fourth amended Schedule C, and FARGL subsequently joined into that objection [ECF 204 and 206].

**Discussion**

*The National Football League Settlement Agreement*

The NFL Class Action Settlement Agreement (the " Settlement Agreement") is an agreement between the National Football League (the "League") and its players[1], arising from "the alleged effects of mild traumatic brain injury allegedly caused by the concussive and sub-concussive impacts experienced by former NFL Football players.[2]" *Class Action Settlement Agreement*, https://www.nflconcussionsettlement.com/Documents.aspx, at 1 (last updated June 18, 2018). It is important to note that the Settlement Agreement explicitly carves out any policies under the League's Collective Bargaining Agreement (CBA); players must pursue claims under these "Original Policies" separately.[3] The Settlement Agreement further provides that the original lawsuits "[sought] to hold the NFL Parties responsible for . . . [failing] to warn and protect them from *the long term health problems associated with concussions* . . . ." *Id.* (emphasis added). The Settlement Agreement allows for a "Monetary Award" for "Qualifying Diagnoses made by properly credentialed physicians." *Id.* at 32. Those Qualifying Diagnoses include: (a) Level 1.5 Neurocognitive Impairment; (b) Level 2 Neurocognitive Impairment; (c) Alzheimer's Disease; (d) Parkinson's Disease; (e) Death with Chronic Traumatic Encephalopathy (CTE); and (f) Amyotrophic Lateral Sclerosis (ALS). *Id.*

---

[1] The Settlement Agreement provides that "[t]he 'Settlement Class' means all Retired NFL Football Players, Representative Claimants and Derivative Claimants." Darryl Edwin Williams was a player in the NFL from 1992-2001 for both the Cincinnati Bengals and the Seattle Seahawks.

[2] The litigation took place in the District Court for the Eastern District of Pennsylvania; See generally *In re National Football League Player's Concussion Injury Litigation,* No. 2:12-md-02323-AB, 2014 WL 11512626 (E.D. Pa. Nov. 12, 2014).

[3] See generally Sections 2.1, 13.3, 18.1, 18.5, and 18.6 to the Settlement Agreement.

The Settlement Agreement provides a Baseline Assessment Program (BAP),[4] whereby players can receive a "baseline assessment examination" from "Qualified BAP Providers" (the "Providers"). *Id.* at 20, 21. The exam includes: (1) a neuropsychological exam that must be done by both a board-certified neuropsychologist and a board-certified clinical neuropsychologist; and (2) a basic neurological exam performed by a board-certified neurologist. *Id.* In order to receive a qualified diagnosis for Level 1.5 or Level 2 Neurocognitive Impairment, the diagnosis must be agreed upon by both the neuropsychologist and the neurologist. *Id.* In the event that no agreement is reached, the BAP Administrator may require that (1) the Providers reconvene to come to a definitive conclusion, (2) another BAP examination be completed, or (3) the matter be referred to an "Appeals Advisory Panel." *Id.* at 30. The decision of the Appeals Advisory Panel is "final and binding."[5] *Id.* In the event a player receives a Qualified Diagnosis, his ultimate compensation will depend upon both his age[6] at diagnosis and his number of eligible seasons.[7] The Settlement Agreement explicitly provides that "All Monetary Awards will be subject to downward adjustments." *Id.* at 36. In turn, if a player receives a qualified diagnosis, he is very likely to receive a revised-down Monetary

---

[4] Players *may* receive a Qualified Diagnosis without participating in the BAP, however, their compensation will automatically be subject to a 10% reduction.

[5] Notwithstanding this language, the Agreement does in fact provide a further appeals process, which includes Court involvement; however, because this stage was not reached in the Debtor's case, it is unnecessary to delve into the details.

[6] *See* Exhibit A-5 to the Settlement Agreement. With regards to Level 1.5 or Level 2 Neurocognitive Impairment, the Agreement provides a 30-39% reduction in compensation across age cohorts. For example, a 55 year-old with Level 2 Neurocognitive Impairment will be eligible to receive $950,000, while a 60 year-old with Level 2 Neurocognitive Impairment will only be eligible to receive $580,000. These discrepancies are non-linear and increase dramatically as one moves into the older cohorts.

[7] *See* Exhibit A-5 to the Settlement Agreement. The Agreement provides a 10% reduction in compensation for every ½ year reduction in eligible seasons. For example, a player with 4.5 eligible seasons will receive a 10% reduction in compensation while a player with only 4 eligible seasons will receive a 20% reduction in compensation.

Award. Of course, in the event that he does not receive a qualified diagnosis and has exhausted all appeals, he will not receive any compensation.

### *11 U.S.C. § 522(d)(10)(C) and (E)*

The State of Florida has generally opted out of federal bankruptcy exemptions,[8] prohibiting its debtors from claiming federal exemptions pursuant to Section 522(d); notwithstanding, F.S. § 222.201 provides an exception to that general rule, whereby debtors may claim exemptions under Section 522(d)(10). 11 U.S.C. § 522(d)(10); Fla. Stat.§ 222.201.

Section 522(d)(10), in relevant part, provides exemptions for the following:

> (10) The debtor's right to receive—
> (C) a disability benefit, illness, or unemployment benefit;
> (E) a payment under a stock bonus, pension, profit sharing, annuity, or similar plan or contract on account of illness, disability, death, age, or length of service, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor, unless—
> > (i) such plan or contract was established by or under the auspices of an insider that employed the debtor at the time the debtor's rights under such plan or contract arose;
> > (ii) such payment is on account of age or length of service; and
> > (iii) such plan or contract does not qualify under section 401(a), 403(a), 403(b), or 408 of the Internal Revenue Code of 1986.

At issue here is whether the proceeds from the Settlement Agreement fall into either of these exemptions. The Court finds that the Settlement Agreement provides disability benefits which are exempt under Subsection (C). There is thus no need to assess whether the benefits are exempt under Subsection (E).

### *Debtor's Argument that § 522(d)(10)(C) Applies*

The Debtor's argument misconstrues some important aspects of the Settlement Agreement. Most importantly, Debtor conflates benefits under the Original Policies with those

---

[8] Fla. Stat. § 222.20.

5

under the Settlement Agreement. Debtor proceeds to lay out the requirements for the NFL CBA Neurocognitive Disability Benefit, suggesting that his injuries fall squarely within its scope; however, the benefits in question are *not* those pursuant to the Original Policies. In fact, the Settlement Agreement explicitly carves out the Original Policies, as the Trustee outlines in her argument. Nevertheless, the Settlement Agreement establishes a *new* basis for contractual benefits, thereby creating a *new and separate disability policy* (the "New and Separate Disability Policy").

*Trustee's Argument that § 522(d)(10)(C) Does Not Apply*

Both at hearing and in her Objection [ECF 204], the Trustee relied heavily on *Chesley v. Woodard*, 526 B.R. 888, 895 (M.D. Fla. 2014), which she claims is dispositive of the issue. In *Chesley*, the court analyzed whether proceeds from a tort claim settlement would be exempt under § 522(d)(10)(C), and provided that: "for the exemption to apply . . . it must be established that (1) the proceeds are disability income benefits and (2) these benefits are under a policy." *Chesley*, 526 B.R. at 895. There, the court held that the benefits were not exemptible under § 522(d)(10)(C) because the Debtor did not show that the benefits were pursuant to a disability policy. *Id.* at 896. Similarly, the Trustee suggests that the NFL Settlement Agreement is simply resolving a tort claim, for which there are no exemptions under applicable Florida law. In her Objection, the Trustee provides an exhibit that includes all instances of the word "disability," and its relevant derivatives, within the Settlement Agreement. The exhibit includes multiple sections, which carve out and preserve the Original Policies. The Trustee gives particular weight to Section 18.5, which in relevant part provides that: "***this Settlement Agreement does not alter the showing that Settlement Class Members must demonstrate to pursue successful claims for worker's compensation and/or successful claims alleging***

*entitlement to NFL CBA Medical and Disability Benefits*." (emphasis in original settlement agreement).

Nevertheless, the Trustee's argument fails to see the forest for the trees. The Settlement Agreement establishes a new and separate pool of funds, distinct from those established in the Original Policies, and the language within the Settlement Agreement, along with its overall structure, is undeniably indicative of a disability policy. The Settlement Agreement describes the Debtor's injury as a "Level 1.5 or Level 2 Neurocognitive Impairment;" a "neurocognitive impairment" falls within even the narrowest interpretation of the word "disability." Additionally, it is important to note the fact that compensation is directly linked to a player's length of employment; Exhibit 5 to the Settlement Agreement includes a section entitled: "How does the number of seasons a retired player played affect a monetary award?" This section provides a "number of eligible seasons" matrix, showing that the longer a player's employment tenure, the higher his potential compensation. Additionally, Exhibit 5 includes a section entitled: "How does the age of the retired player at the time of first diagnosis affect a monetary award?" This section provides an age-cohort matrix, which shows that older players are only eligible for a significantly reduced Monetary Award. The Settlement Agreement proceeds are not simple, guaranteed payments, but rather carefully tailored compensation schemes, consistent with and indicative of disability policies.

Most importantly, however, is the overall *structure* of the Settlement Agreement and the medical procedures in place to filter claims. The Settlement Agreement requires that injured parties be diagnosed by qualified medical professionals before they may be eligible for benefits. Moreover, the Settlement Agreement itself provides for a Baseline Assessment Program whereby parties may receive an initial medical screening. Contrary to a traditional tort claim settlement,

whereby aggrieved parties are *automatically* and *indiscriminately* paid a lump-sum, the Settlement Agreement requires players to jump through a multitude of procedural hoops in order to gain a qualified diagnosis, after which their claim is subjected to additional differentiation and limitations.   Under the Settlement Agreement scheme, compensation is never guaranteed, and there is always a possibility that players do not receive a Monetary Award.   Additionally, it is important to note that the Settlement Agreement does not just include the Debtor, but hundreds and potentially thousands of former NFL players.   In turn, the Settlement Agreement establishes a "policy" to adjudicate each individual claim on its merits in order to determine whether compensation is warranted.   This is vastly different from a traditional class action tort claim settlement, where no matter the size of the class, payouts are fully determined *ex-ante*.   Here, however, the amount of compensation (if any) is only fully determined *ex-post*, after all of the procedural hurdles have been overcome.

      The fact that the Settlement Agreement explicitly carves out all other non-settlement related benefits is of little significance.   It is of no concern that the Settlement Agreement carves out the *Original Policies* under the CBA, because it has created a *New and Separate Disability Policy*.   Of course, the NFL would want to make the New and Separate Policy proceeds mutually exclusive from the Original Policy proceeds so as to insulate the League from automatically triggering additional claims.   Indeed, the careful and repetitive language used to carve out the Original Policies is indicative of the drafters' concern for the Settlement Agreement's striking similarities to traditional disability policies.   Moreover, focusing on the Settlement Agreement's intent to carve out the Original Policies misses the point: the Settlement Agreement establishes a separate pool of money, and more specifically, a *new and separate disability policy*, whereby injured parties can receive compensation.

The NFL Settlement Agreement created a new and separate disability policy through which injured parties are able to receive disability benefits. There is little to suggest that the Settlement Agreement intends to resolve a tort claim; rather, the explicit language of the Settlement Agreement as well as the overall structure suggest that the benefits are pursuant to a separately created policy, which this Court interprets as a disability policy within the meaning of § 522(d)(10)(C).   Therefore, any payments to the Debtor pursuant to the Settlement Agreement are exempt under 11 U.S.C. § 522(d)(10)(C).   Accordingly, the Trustee's Objection is **OVERRULED**.

SO ORDERED.
# # #

Copies to:     All Parties in Interest